CINCINNATI TOOL STEEL COMPANY, Plaintiff-Appellant, v. PATRICIA BREED, Defendant-Appellee.

Second District   No. 84—1025

Opinion filed August 14, 1985.

268

Thomas D. Luchetti, P.C., of Rockford, for appellant.

Alan H. Cooper and Pedderson, Menzimer, Conde, Stoner & Killoren, of Rockford, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Plaintiff Cincinnati Tool Steel Company appeals from an order of the circuit court of Winnebago County which entered judgment in favor of defendant Patricia Breed, a former employee of plaintiff, at the close of plaintiff's case. The sole question presented by this appeal is whether the trial court's denial of plaintiff's application for an injunction constitutes an abuse of discretion. Because we conclude the trial court's decision does not amount to an abuse of discretion, we affirm.

Plaintiff is a distributor of tool and die steels primarily to customers in Illinois, Wisconsin and Ohio, with headquarters in Rockford, Illinois, and a division in Elk Grove Village, Illinois. Ronald Cincinnati is president and owner of plaintiff, Ken Klehr is vice-president, and defendant is a former employee of plaintiff. Cincinnati, Klehr and defendant were the only witnesses to testify in the trial

court.

Defendant began work with plaintiff in 1978 as a typist. She later held the positions of receptionist, sales secretary, and sales coordinator. In October of 1980, she became purchasing agent and in July of 1981, she became an inside sales person. In November of 1982 defendant was promoted to office manager/sales manager.

Prior to July 28, 1983, defendant's employment was without a written contract, but on that date defendant executed a written employment agreement with plaintiff which by its terms extended for six months from the date of the agreement. The employment agreement was admitted into evidence as plaintiff's exhibit No. 4.

On approximately June 21, 1984, defendant had a discussion with a friend and neighbor, Barry Bennett, who informed her that a competitor of plaintiff, J. Rubin & Company (Rubin), might be interested in hiring her. Bennett told defendant that in a recent call to a Mr. Schappert, an employee of Rubin, he had mentioned to Schappert that he knew an inside sales person who was seeking different employment. Defendant denied asking Bennett to uncover employment opportunities on her behalf.

Defendant sent a resume to Schappert with a cover letter on or about June 25, 1984, both of which were introduced as plaintiff's exhibit No. 2. On June 28, 1984, after a luncheon meeting with Schappert and a tour of the Rubin premises, defendant accepted a job with Rubin as an inside sales person. She returned to plaintiff that day, met with Cincinnati and resigned. Defendant offered to give two weeks' notice, but Cincinnati upon learning that defendant intended to work for a competitor asked her to leave immediately. Defendant then organized the paperwork on her desk, and distributed it to other employees.

Later that day, defendant met again with Cincinnati, this time with Klehr also present. During this conversation, Cincinnati told defendant that she was still under contract and if she accepted this job, plaintiff would seek an injunction.

Defendant began work for Rubin the following Monday, July 2, 1984. On that same day, plaintiff filed its complaint and motion for temporary restraining order (TRO). Count I sought to enjoin defendant from disclosing confidential information apparently based upon common law, fiduciary duty principles. Count II sought similar relief based upon the employment contract. Count III sought to prohibit defendant from working for Rubin or any other competitor and from soliciting any of plaintiff's customers with whom defendant had contact during her employment with plaintiff. That same morning, the

court issued a TRO without notice to defendant, enjoining her from contacting or soliciting those customers of plaintiff for which she was responsible or with whom she had had any contact during her employment with plaintiff and from disclosing or using any trade secrets, technical data or know-how or any other proprietary information belonging to plaintiff. The TRO and plaintiff's motion for a preliminary injunction were extended by stipulation to July 23, 1984, and were thereafter extended until August 15, 1984. On that date, after hearing the testimony of defendant as an adverse witness, the trial court modified the TRO by dissolving the injunction prohibiting defendant from making contact with customers of plaintiff.

On August 17, 1984, plaintiff filed an emergency motion to reinstate the TRO which the trial court denied. The trial resumed on October 1, 1984. At the close of plaintiff's case in chief, the trial court granted defendant's motion for judgment, dissolved the remaining TRO which had prohibited defendant from disclosing information and denied the motion for a preliminary injunction. Plaintiff thereafter filed a timely interlocutory appeal.

■ Prior to resolving the merits of this appeal, we must identify the precise relief which plaintiff has requested this court to grant. Plaintiff's notice of appeal specified that it appealed from the order "granting Defendant's Motion for Judgment, dissolving the Temporary Restraining Order, and denying Plaintiff's application for a Preliminary injuncion [*sic*] *entered on October 15, 1984.*" (Emphasis added.) The portion of the TRO which had prohibited defendant from soliciting plaintiff's customers had been dissolved by the trial court on August 15, 1984, and thus, the propriety of that order of the trial court apparently is not raised in this appeal. The relief sought by plaintiff in its initial brief to this court confirms that it did not appeal the trial court's order dissolving the TRO of August 15, 1984. In the "Conclusion" portion of its brief, plaintiff requested that:

> "[T]his Court reverse and remand the cause for further proceedings and that the Temporary Restraining Order heretofore entered be reinstated forthwith by this Court. Since it has been almost six months from Defendant's termination on June 28, 1984, Plaintiff recognizes that the issue of whether Defendant should be restrained from contacting customers will probably be moot by the time of decision. Plaintiff urges that the Temporary Restraining Order regarding nondisclosure of confidential information be reinstated."

Supreme Court Rule 341(e)(8) (87 Ill. 2d R. 341(e)(8)) provides that the initial appellate brief shall contain a "Conclusion" stating

the precise relief sought. By the wording of its own prayer for relief, plaintiff requested only that the TRO prohibiting disclosure of confidential information be reinstated and did not request that the TRO prohibiting solicitation of customers be reinstated. Plaintiff apparently elected not to seek the latter relief because as he qualifiedly admits, that issue would be moot prior to this court's resolution of its appeal. Because of plaintiff's limited prayer for relief, this court need not consider the arguments in the parties' briefs regarding the enforceability of the covenant not to compete. By its own language, that covenant only restricted defendant in her solicitation of plaintiff's customers, and plaintiff has conceded that this issue is now moot.

In order to obtain a preliminary injunction prohibiting defendant's disclosure of confidential information, plaintiff was required to establish it possessed a certain and clearly ascertainable right which needed protection, it would suffer irreparable injury without the protection of an injunction, no adequate remedy at law existed for its injuries, and it would likely be successful on the merits. (*Midwest Micro Media, Inc. v. Machotka* (1979), 76 Ill. App. 3d 698, 702, 395 N.E.2d 188, 191.) The trial court is vested with a large measure of discretion in the allowance or denial of a preliminary injunction, and its determination will not be disturbed absent the showing of the abuse of that discretion. *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 441 N.E.2d 927.

These four elements necessary for a preliminary injunction are conjunctive. Prior to discussing the other elements, certain of plaintiff's allegations can be disposed of on the basis that plaintiff has failed to establish the element of irreparable harm. In its application for a preliminary injunction, plaintiff alleges on information and belief that defendant secretly carried off from its premises originals or copies of cost data, pricing lists and customer lists. Defendant at the hearing denied appropriating any documents. This court in *Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 468 N.E.2d 797, concluded irreparable harm had not been shown where the former employees expressly denied taking any documents from their former employer. In *Smith Oil*, this court stated the plaintiff had made a showing that records were missing from the individual defendant's offices, but had not introduced any proof that "any of the defendants actually took or possessed any such material." 127 Ill. App. 3d 423, 431, 468 N.E.2d 797, 802-03.

Here, the record does not even disclose that documents were missing. The only evidence in this regard cited by plaintiff concerns

the day defendant informed plaintiff of her decision to leave. Klehr testified defendant's desk was in great disarray which made him apprehensive. Cincinnati testified he examined her desk looking for a receivables aging document and a folder on one particular customer and he "couldn't tell if they were all there." As defendant highlights, however, Cincinnati asked Donna Call, comptroller of plaintiff, to observe defendant as defendant was preparing to leave the premises on the day of her resignation and admitted that Call told him that she did not see defendant take anything. Furthermore, the record contains no testimony from Cincinnati that the two documents for which he was looking should have been on defendant's desk and more important, contains no testimony that the documents were still missing at the time of trial. Even if plaintiff's testimony can be construed as establishing that certain documents were missing, plaintiff has not established a *prima facie* case that defendant took the document. Just as in *Smith Oil*, defendant here expressly denied taking any documents. Any suggestion that defendant did take documents on this record "is purely speculative" and insufficient to establish irreparable injury. See *Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 432, 468 N.E.2d 797, 803.

What remains to be evaluated is plaintiff's contention that defendant retained in her memory certain confidential information when she left plaintiff's employ. To warrant reversal of the trial court's denial of its injunction application, plaintiff must establish that the trial court's findings of no protectable interest, no irreparable injury, and no likelihood of success on the merits constitute an abuse of discretion.

## A. PROTECTABLE INTERESTS

As this court emphasized in *Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 468 N.E.2d 797, a distinction must be drawn between the protection afforded an employer who has bound his employee by a restrictive covenant and one who relies exclusively upon common law restrictions against disclosure of confidential information. While an enforceable restrictive covenant may protect material which does not constitute a trade secret, an employer's protection absent a restrictive covenant is narrower and extends only to trade secrets (127 Ill. App. 3d 423, 427, 468 N.E.2d 797, 800), or near-permanent customer relationships. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 356, 425 N.E.2d 1034, 1036.) The predicate question, therefore, is whether defendant's freedom was limited by a valid and enforceable restric-

tive covenant or was merely restricted by common law principles.

Plaintiff in its initial appellate brief conceded that any right to injunctive relief predicated upon paragraph 5(a) (the covenant not to compete) in the employment agreement would be moot because that provision only restricted defendant's employment in a competitive business for a period of six months following termination of the agreement. However, in count II of its application for a preliminary injunction, plaintiff predicated its right to an injunction prohibiting defendant from disclosing information on paragraph 4(b) of the parties' employment agreement. In that paragraph, defendant acknowledges she has access to confidential information of plaintiff and "agrees that she will not, for any reason or purpose whatsoever, during or after the term of her employment, disclose any of such confidential information to any party without express authorization of the Board [of Directors] ***." That clause further provides that plaintiff will be entitled to an injunction and/or damages for a breach or threat of breach of paragraph 4. The language of paragraph 4(b) purports to restrict defendant from disclosing information forever.

The question which arises from these facts is whether confidentiality agreements such as paragraph 4(b) are subject to the same rules which govern the enforceability of covenants not to compete. Recently, the appellate court in *Disher v. Fulgoni* (1984), 124 Ill. App. 3d 257, 464 N.E.2d 639, answered this issue of first impression in Illinois in the affirmative. The confidentiality agreement construed in *Disher* was very similar to paragraph 4(b), prohibiting the plaintiff employee from disclosing without either chronological or geographical limitation a variety of information "to any third party." (124 Ill. App. 3d 257, 259, 464 N.E.2d 639, 641.) Apparently, the agreement did not specifically restrict the employee from working for a competitor. Concluding that an employee confidentiality agreement, like a covenant not to compete, can be invalidated on the basis of excessive geographical and durational scope, the *Disher* court reversed the trial court's denial of the plaintiff's application for preliminary injunctive relief. In support of its conclusion, the *Disher* court construed the confidentiality agreement as imposing a restraint on trade similar to that imposed by a covenant not to compete and thus stated that both types of clauses should be carefully construed by Illinois courts. Because both confidentiality agreements and covenants not to compete affect State interests such as the free flow of information necessary for business competition, the *Disher* court stated, confidentiality agreements like covenants not to compete should only be enforceable if their chronological and geographical limitations are reasonable, the

information which they seek to protect is in fact confidential, and their restrictions are reasonably necessary for the protection of a legitimate proprietary interest. 124 Ill. App. 3d 257, 262, 464 N.E.2d 639, 643.

■ Applying these criteria to paragraph 4(b), we conclude the paragraph is unenforceable. The clause contains no limitation on the duration of its disclosure provision, instead prohibiting any disclosure "during or after the term of her employment." Nor does it contain a geographical limitation. Rather, it simply prohibits disclosure to any party. In fact, by prohibiting disclosure to any party, the clause purports to restrict disclosure to anyone and not just to competitors or even to persons employed in the tool and die steel field. (Compare *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 477 N.E.2d 35 (covenant not to compete without geographical limitation held unreasonable); *Akhter v. Shah* (1983), 119 Ill. App. 3d 131, 456 N.E.2d 232 (restrictive covenant containing no geographical or durational restriction held unenforceable).) Also undermining the enforceability of the clause is the fact that the employment contract of which paragraph 4(b) was one condition only covered a six-month period, and it would seem unconscionable to allow such a short-term agreement to prohibit defendant's disclosure of information forever. While Illinois courts have concluded that no one factor will determine conclusively the enforceability of a covenant, they have not enforced a covenant without at least a durational restriction, a geographic restriction or a limitation on the parties to whom the employee is prohibited from disclosing information. (See generally Sabin, *Constructing a Viable Restrictive Covenant in Employment Contracts*, 72 Ill. B.J. 310 (1984).) The unlimited scope of paragraph 4(b) renders it unenforceable and thus, plaintiff did not establish a valid contractual right to prohibit defendant from disclosing information.

Because paragraph 4(b) is invalid and because plaintiff has conceded that the prohibitions in paragraph 5(a) are mooted by the expiration of the six-month period, defendant is not subject to any contractual restriction, and, therefore, plaintiff must have established a trade secret or a near-permanent customer relationship to warrant injunctive relief. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034; see generally Annot., 28 A.L.R.3d 7 (1969).) Although plaintiff does not contend defendant possesses a trade secret in the sense of a plan or its design concerning a company process, plaintiff does argue that its customer list is a trade secret which defendant, through familiarity obtained while employed by plaintiff, has retained in her memory.

■ A customer list in certain circumstances can constitute a trade secret. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034.) The court in *Lincoln Towers* summarized the factors which determine if a customer list constitutes a trade secret.

"After reviewing the decisions in this area, we find that Illinois courts have held that a customer list or other customer information constitutes a trade secret in which an employer holds a protectable interest where the list has been developed by the employer over a number of years [citations], the employer developed the list at great expense [citations], and the information was kept under lock and key. [Citations.] However, the same type of information has not been held to be a trade secret where it has not been treated as confidential and secret by the employer [citations], was generally available to other employees [citations], the information was known to those in the field or could be easily duplicated by reference to telephone directories, or professional publications [citations], and where customers did business with more than one company or otherwise changed businesses frequently so that they were known to an employer's competition. [Citations.]" (99 Ill. App. 3d 353, 358, 425 N.E.2d 1034, 1038.)

While a business can have a proprietary interest in lists of customers which it maintains, no business has a proprietary interest in customers themselves. *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 714-15, 390 N.E.2d 68, 72.

Neither party really emphasizes the factors cited in *Lincoln Towers* concerning the number of years over which plaintiff has developed its customers. However, Cincinnati testified he established plaintiff in December 1976 and defendant resigned from plaintiff in June 1984. Therefore, plaintiff could only have developed an interest in customers over a 7½ year period.

Concerning whether the customer list was developed at great expense, plaintiff asserts it established during the hearing that it expended considerable amounts of money, time and effort in developing its customers. For example, plaintiff emphasizes Klehr testified that on three or four occasions, the company paid for defendant to visit a major account in Ohio. Also, defendant was sent to tool and die meetings in Rockford, Illinois, and to the company golf outings. Cincinnati also testified the company had gone to great time and expense to solicit the customers listed in its exhibit No. 2 and employed nine full-time outside sales people "that keep in contact with

these customers on a routine basis to keep our position with these companies."

Defendant responds that the above testimony does not establish that the identity of its customers constitutes a trade secret. As defendant points out, plaintiff's evidence does not differentiate between the ordinary costs of business solicitation and the costs of developing a specific customer base. The expenses testified to by witnesses for plaintiff necessarily would have been incurred irrespective of whether the customers were developed by plaintiff initially or sought out plaintiff solely because of the attractiveness of plaintiff's price. Concerning the expenses directly associated with defendant, Cincinnati even admitted that defendant's four trips to Ohio "didn't have anything to do with getting the account," but rather were for providing subsequent service to the customer. Plaintiff offered no evidence that it spent time and effort to advertise or spent money on promotion or public relations to develop its customer base. While not alone fatal to plaintiff's claim, it also failed to provide *any* time and dollar amounts expended to compile its list of customers. These failings undercut Cincinnati's claim that "we've gone to a great deal of time and expense to solicit."

Also significant is whether the information regarding plaintiff's customers was kept under lock and key; in other words, whether the information was treated as confidential and secret by plaintiff. Despite the protestations of Cincinnati and Klehr to the contrary, the record discloses that the customer lists alleged to be confidential were in fact not kept secret inside the company. Defendant testified that in her department no information was locked up and everyone had access to such information, including inside and outside sales personnel, employees in the accounting department, the dock workers and even the receptionist. In fact, the receptionist mailed invoices to customers every day and next to her desk was a Magnadex card file with the names of each customer, the purchasing agent for each account, and in some cases even the customer's prices and discounts. Defendant specifically testified that when she was a member of plaintiff's management, she would not have denied a dock worker access to the Magnadex card file and had actually observed workers consulting that file when she was employed by plaintiff. While defendant admitted some documents were marked "Confidential," she contends plaintiff did not sustain its burden of demonstrating to the court which documents were marked confidential to enable the court to fashion an appropriate injunction.

■ Plaintiff responds that access to the material was limited.

Cincinnati testified that the information he asserted was confidential was available only on a need-to-know basis to managers only. Cincinnati testified many of the documents were marked confidential, and the managers were told to treat the documents as confidential. While admitting that employees not subject to a written restrictive covenant had access to the information, Cincinnati testified that he or the manager in the department at the time was charged with the responsibility of restricting access. This testimony does not in fact establish, however, that access was limited; rather, only that Cincinnati testified access should have been limited to the managers. To the extent Cincinnati's testimony directly contradicts that of defendant, the trial court assessed their credibility and ruled that plaintiff had not sustained its burden of proof. The trial court's finding was not against the manifest weight of the evidence.

■ Plaintiff's citation to *Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 451 N.E.2d 1338, is inapposite. There, the court stated that a company's failure to mark documents confidential and to keep them "under lock and key" does not establish the information was not confidential. *Lawter* is inapposite for several reasons. First, while the absence of such precautions does not establish conclusively that the documents are not confidential, it does amount to evidence supporting that conclusion. Second, in *Lawter*, the record warranted issuance of a preliminary injunction. For example, the employee admitted in discovery that he had taken from his former employer several boxes of information including the location and purchasing habits of and contact person for the employer's customers. In light of the substantial evidence that materials including customer lists were taken from the former employer, the *Lawter* court understandably found insignificant the fact that the employer had not locked up all documents or marked them confidential. Here, in contrast, plaintiff presented no concrete evidence that defendant took anything when she left plaintiff's employment, and thus, plaintiff must rely upon the measures it took to restrict access to the information to establish that the documents were in fact confidential. Finally, *Lawter* involved the sale of a business where the interest to be protected is good will and where the bargaining power of the buyer and seller is relatively equal. In contrast, as the court in *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 13, 477 N.E.2d 35, 38, recognized in distinguishing *Lawter*, courts are more likely to declare post-employment covenants invalid because of the inequality in bargaining power between the employer and the employee.

Additional factors which, if present, suggest that a customer list

is not a trade secret are if the information can be duplicated easily by reference to telephone directories or professional publications and if the customers conduct business with more than one supplier. Defendant did testify that plaintiff's customers could be found in a telephone directory. This factor in this case, however, should not be deemed too significant, because the presence of customer names in the telephone directories does not establish that a competitor could compile the list from the directories without also knowing the businesses in which the customers were operating.

■ The intense competition in the tool and die steel industry, however, does make unlikely that the customers of plaintiff constituted a trade secret. Plaintiff's employee Klehr testified the industry was highly competitive and that a customer might buy from plaintiff one day and its competitor the next. Cincinnati testified that many customers on plaintiff's exhibit No. 2 were customers he had initially contacted in his prior employment with two competitors, J. Rubin & Company, and Jessop Steel Company. This testimony suggests and Klehr's testimony confirms that the customers did business with many companies in the industry and that, therefore, the customer's identities were known to plaintiff's competitors.

■ The intense competition based upon price in this industry likewise refutes the plaintiff's contention that it enjoyed near-permanent customer relationships; another basis upon which a company can assert entitlement to injunctive relief. Klehr's testimony that customers would buy from plaintiff one day and from a competitor the next undermines any argument of permanency. However, Klehr also testified that plaintiff's exhibit No. 2 containing approximately 118 customer names was a list of major accounts that either had contractual arrangements with plaintiff or obtained special pricing on plaintiff's products. Klehr characterized exhibit No. 2 as a permanent-relationship list. However, additional statements by Klehr belie his conclusion of permanency. In cross-examination, Klehr could not name one company listed on exhibit No. 2 that bought exclusively from plaintiff. Acknowledging that plaintiff's business was highly competitive, involving 15 to 30 competitors in the Rockford area alone for sales of the same products, Klehr admitted that the customers listed in exhibit No. 2 bought from plaintiff's competitors as well as from plaintiff and might buy the same products from plaintiff one day and from its competition the next.

❂11 Concerning its contractual customers, Klehr admitted that contracts were reached through an open-bid, competitive bidding process and after expiration of the contract, a new competitive bidding

process would likely occur. Despite Klehr's description of these customer relationships as near-permanent, his conclusion is unsupported by even his own testimony. For example, defendant could not impair the contractual relationships with plaintiff while the contract between the customer and plaintiff was in effect, and after expiration of the contract, the customer would conduct an open-bidding process at which time presumably both plaintiff and Rubin could submit a bid. The price at which plaintiff had previously won the contract would be known to Rubin because the customer would have disclosed the bids of the competitors at the time the contract had been let to plaintiff. Therefore, the open-bid process made public the successful bid price and the identity of the customers who bid on the contract. While plaintiff in its reply brief asserts entitlement to protection precisely because the market is competitive, its argument is unpersuasive absent proof, which it has failed to offer, of a near-permanent relationship with its customers.

■■■ In addition to its customer list, plaintiff also asserts it has a protectable interest in its pricing which warrants injunctive relief. The record reveals that plaintiff's Rockford division has 2,500 customers and that the prices plaintiff charged for its products were not the same for all of its customers. Plaintiff sold 30 different grades of steel, three different shapes of steel (rounds, squares and flats), and hundreds and hundreds of different sizes, all of which affected the price quoted to a particular customer. Defendant testified that when she worked for plaintiff, it would have been impossible for her to remember what prices the company charged to each of its 2,500 customers for each grade, shape and size of steel, and further testified that she set prices by reference to documents rather than from memory. Plaintiff questioned defendant as an adverse witness regarding her memory of pricing information. Plaintiff asked defendant whether based upon her knowledge of plaintiff's customer discounts, she could as an employee of Rubin undercut plaintiff's price. Defendant responded that she could not. Defendant conceded that she might be able to recall some customer's pricing discounts, although she admitted she had a "terrible recollection of numbers and dates." Plaintiff then asked defendant to assume both that she could remember a certain customer's pricing discount and that Rubin could afford to sell the product for the same price as plaintiff could offer. Based upon these assumptions, defendant stated she might be able to undercut plaintiff's price. This admission is too qualified and conjectural to establish that defendant retained confidential pricing information.

■■■ Defendant also highlights as suggestive of the nonsecret

nature of plaintiff's prices the testimony of Cincinnati concerning the lost-quote file. Compiled with information from the purchasing agents of its customers, the lost-quote file is used by plaintiff to gather information on the prices of plaintiff's competitors. Cincinnati explained that part of his outside salesmens' job responsibility is to find out from the purchasing agents of its customers why plaintiff's prices weren't competitive. Defendant explained the importance of the lost-quote file.

> "Well, when a customer calls in and inside sales person prices him and he doesn't get an order he may or may not ask the customer how he looked on the prices. Usually we will leave that up to the outside salesmen and when the outside salesman calls in the inside salesman advises him of his account called in and what he quoted them and the inside saleman [*sic*] follows it up from there, he will call the purchasing agent and asked him how he looked on the quote and tried to get as much information as he could from him, who are the competitors, what kind of prices did they give you in comparison to them and he would note that the next day. He would have a copy."

Defendant further testified in response to questioning from plaintiff that because the purchasing agents were disclosing the competitors' prices to Cincinnati, they must have been disclosing plaintiff's prices to its competitors. Plaintiff did not present evidence contradicting defendant's conclusion. Based upon the testimony concerning the lost-quote file, defendant persuasively argues that price information was not confidential, but rather was traded freely by the purchasing agents of the customers buying from plaintiff and its 15 to 30 local competitors.

Plaintiff replies that the lost-quote file only made known the bid price, but not information concerning plaintiff's costs, special discounts and supply information. That these elements were not disclosed does not impair, however, defendant's contention that prices were known throughout the industry. With respect to the various elements of affecting the bid price (cost, special discounts and supply information), plaintiff's burden was to provide evidence that this information was confidential, was known to defendant, and could be used by defendant to the detriment of plaintiff when defendant was employed by a competitor. Review of the record establishes that plaintiff failed to meet this burden and thus, the trial court's denial of its application for injunctive relief was not an abuse of discretion.

## B. IRREPARABLE INJURY

■■ Because we affirm the trial court's finding that plaintiff failed to make out a *prima facie* showing of a protectable interest, this court need not decide whether the trial court correctly found that the plaintiff had not made a sufficient showing with respect to irreparable injury. We note, however, that defendant expressly denied that she had either disclosed confidential information or intended to disclose such information in the future. To warrant injunctive relief, an applicant must establish that he will suffer irreparable harm without the allowance of the injunction. (*Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 468 N.E.2d 797.) Because of defendant's express denial that she had disclosed or would disclose any confidential information or that she even possessed such information, defendant likely did not establish a *prima facie* case of irreparable injury merely by offering evidence that defendant used customer and price data in her work while employed by plaintiff.

## C. LIKELIHOOD OF SUCCESS ON THE MERITS

■■ Based upon plaintiff's failure of proof with respect to a protectable interest, the trial court did not abuse its discretion in denying plaintiff's application for injunctive relief in part on the basis that plaintiff had not established the likelihood of success on the merits.

■■ Defendant's motion to strike plaintiff's reply brief as containing scandalous and impertinent material is denied, but we admonish plaintiff's counsel to avoid the use of invectives in briefs submitted to this court.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

HOPF and STROUSE, JJ., concur.