AMP INCORPORATED, a corporation,
Plaintiff-Appellant-Cross-Appellee,

v.

James FLEISCHHACKER, and Molex
Incorporated, a corporation,
Defendants-Appellees-Cross-Appellants.

Nos. 86–1573, 86–1635.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1986.
Decided July 16, 1987.

Clyde F. Willian, Willian, Brinks, Olds, Hofer, Gilson & Lione, Ltd., Chicago, Ill., for plaintiff-appellant-cross-appellee.

Philip M. Kohlmainen, Mason, Kohlmainen, Rathburn & Wyss, Chicago, Ill., for defendants-appellees-cross-appellants.

Before BAUER, Chief Judge, and CUMMINGS and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff appeals the district court's entry of final judgment in favor of the defendants after a bench trial. We affirm.

The plaintiff, AMP Incorporated, brought this action against a former employee, James Fleischhacker, and one of its competitors, Molex, alleging unfair competition and misappropriation of trade secrets. AMP is the world's leading producer of electrical and electronic connection devices. It is by far the largest company in the connector industry, with over 21,000 employees and 1983 reported sales of over one-and-one-half billion dollars and net income of about $163 million. AMP's Components & Assemblies Division, headquartered in Winston-Salem, North Carolina, is one of its major divisions, generating in excess of $100 million in gross sales per year.

Molex is a principal competitor of AMP's Components & Assemblies Division and has its principal place of business in Lisle, Illinois. Molex's annual sales are in excess of $250 million, with foreign sales accounting for over half of that total. A significant portion of Molex's total sales is attributable to products that compete directly with products manufactured by AMP's Components & Assemblies Division.

The present controversy involves the 1984 hiring by Molex of defendant James Fleischhacker, formerly the Division Manager of AMP's Components & Assemblies Division, to fill the position of Director of Marketing for Molex's Commercial Products Division. Mr. Fleischhacker, who holds a Bachelor of Science degree from the University of Minnesota and a Master's degree from the Massachusetts Institute of Technology, joined AMP in 1973. He rapidly advanced through the corporation and in 1982 was named Manager of the Components & Assemblies Division, the position he held until he resigned in 1984. As Division Manager, Mr. Fleischhacker supervised approximately 1200 people who were responsible for the manufacture and sale of 10,000 different component parts. His duties as Division Manager included reviewing and approving business programs, interfacing with group management, implementing strategic policies and plans, and developing personnel. His primary energies, however, were devoted to motivating and coordinating the efforts of others. His ability and performance at AMP were rated as exceptional and he was told that he had the potential of rising higher within AMP's corporate structure and even of becoming president of the corporation. His honesty, integrity, loyalty, discretion, and judgment while employed by AMP were consistently rated as good to excellent in formal evaluations and by the testimony of his co-workers.

In 1982 Molex decided to create a new position, Director of Marketing, in its Commercial Products Division. An executive search firm directed Molex to Mr. Fleisch-

hacker, whom Molex found to be a desirable and highly qualified candidate for the position as a result of his background, education, skill, and ability, including demonstrated product management capabilities, and especially because of his knowledge of the connector industry. Molex made a written offer of employment to Mr. Fleischhacker at the end of 1983, which he accepted in February 1984.

AMP has alleged that Molex's hiring of Mr. Fleischhacker is part of a larger pattern of conduct by Molex involving the misappropriation and threatened misappropriation of AMP's trade secrets and other confidential information, and the solicitation and hiring of AMP personnel. Given the nature of the competition between Molex and AMP, the nature of the respective positions held by Mr. Fleischhacker at AMP and Molex, and an alleged propensity on the part of Molex to misappropriate AMP's internal information without regard to its proprietary nature, AMP maintains that it is inevitable that Mr. Fleischhacker and other AMP personnel hired by Molex will use and disclose AMP trade secrets and confidential information for the benefit and unjust enrichment of Molex. AMP therefore initiated this litigation in an effort to obtain both legal and equitable relief for the alleged misappropriation of its trade secrets and confidential information which will result if Mr. Fleischhacker is allowed to continue in his position as Director of Marketing for Molex's Commercial Products Division. In addition, AMP sought legal and equitable relief against Molex as a result of its pattern of unfair competition involving the solicitation of AMP personnel to obtain AMP trade secret and other confidential information.

After a trial on the merits, the district court entered judgment in favor of the defendants, denying injunctive relief and damages against Molex for unfair competition, and denying injunctive relief against Molex and Mr. Fleischhacker to prevent trade secret misappropriation. In its judgment order and subsequent order clarifying

the original order, the district court explained that because of their relatively simple design and the ease with which they could be copied, the products manufactured by AMP's Components & Assemblies Division did not constitute protectible trade secrets. The district court also held that although AMP had established the existence of protectible business information, it had failed to show any likelihood that Mr. Fleischhacker would compromise any confidential information known to him. AMP appeals the district court's judgment.

Resolution of the issues presented by this appeal requires an analysis of the Illinois law of trade secrets.[1] We must first take note of the distinction drawn by Illinois law between the protection afforded an employer who has bound his employee by an enforceable post-employment restrictive covenant not to compete and one who relies exclusively upon common law restrictions against disclosure of confidential information. To our considerable dismay, this distinction is one which the parties have chosen largely to ignore. While an enforceable restrictive covenant may protect material, such as confidential information revealed to an employee during the course of his employment, which does not constitute a trade secret, an employer's protection absent a restrictive covenant is narrower and extends only to trade secrets or near-permanent customer relationships. See *Cincinnati Tool Steel Co. v. Breed*, 136 Ill.App.3d 267, 274, 90 Ill.Dec. 463, 467, 482 N.E.2d 170, 174 (2d Dist.1985); *Smith Oil Corp. v. Viking Chemical Co.*, 127 Ill.App.3d 423, 427, 82 Ill.Dec. 250, 253, 468 N.E.2d 797, 800 (2d Dist.1984); *Tower Oil & Technology Co. v. Buckley*, 99 Ill.App.3d 637, 644, 54 Ill.Dec. 843, 849, 425 N.E.2d 1060, 1066 (1st Dist.1981) ("[N]either the existence nor misuse of a trade secret is required to enforce a restrictive covenant.").

■ Thus the initial question to be resolved is whether Mr. Fleischhacker was

---

**1.** Jurisdiction in the district court was based on diversity of citizenship and the parties agree

that Illinois law governs this action.

bound by a valid and enforceable restrictive covenant or was merely restricted by common law principles. The record indicates that he was not bound by a restrictive covenant not to compete. He did, however, sign a confidentiality agreement when he first became employed at AMP whereby he agreed *inter alia*:

> (3) To keep confidential during and subsequent to the period of said employment, except for those whom his authorized activities for the Company require should be informed, all information relating to the Company's business, its research or engineering activities, its manufacturing processes or trade secrets, its sources of supply or lists of customers and its plans or contemplated actions.

(Invention Agreement, Pl.Ex.C). The language of this confidentiality agreement purports to prohibit Mr. Fleischhacker from disclosing to any non-AMP personnel any information relating to AMP and its operations forever. The Illinois courts have held unenforceable nearly identical provisions in confidentiality agreements because (1) they contain no limitation on the duration of the nondisclosure provision, instead restricting disclosure "during and subsequent to the period of said employment," and (2) they contain no geographical limitation or other kind of limit on the parties to whom the employee is prohibited from disclosing information. See *Cincinnati Tool Steel Co. v. Breed*, 136 Ill.App.3d at 275–276, 90 Ill.Dec. at 468, 482 N.E.2d at 175; *Disher v. Fulgoni*, 124 Ill.App.3d 257, 262, 79 Ill.Dec. 735, 739, 464 N.E.2d 639, 643 (1st Dist.1984). Confidentiality agreements without such limitations constitute, in the view of the Illinois courts, unreasonable restraints on trade which unduly restrict the free flow of information necessary for business competition. *Id.*

Because Mr. Fleischhacker is not subject to any enforceable contractual restrictions, AMP was first required to establish the existence of genuine trade secrets in order for injunctive relief to be warranted. The Illinois Supreme Court has defined a trade secret as "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 92, 273 N.E.2d 393, 395 (1971). It is generally recognized in Illinois that at the termination of employment, an employee may not take with him confidential, particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors. On the other hand, an employee is free to take with him general skills and knowledge acquired during his tenure with his former employer. See *Schulenburg v. Signatrol, Inc.*, 33 Ill.2d 379, 387, 212 N.E.2d 865, 869 (1965), certiorari denied, 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966); *Smith Oil Corp. v. Viking Chemical Co.*, 127 Ill.App.3d 423, 427, 82 Ill.Dec. 250, 253, 468 N.E.2d 797, 800 (2d Dist. 1984); *MBL (USA) Corp. v. Diekman*, 112 Ill.App.3d 229, 236, 67 Ill.Dec. 938, 944, 445 N.E.2d 418, 424 (1st Dist.1983). Furthermore, while recognizing that a business must be afforded protection against the wrongful appropriation of confidential information by a prior employee who held a position of confidence and trust, the Illinois Supreme Court has emphasized that:

> the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.

*ILG Industries v. Scott*, 49 Ill.2d at 93–94, 273 N.E.2d at 396.

The district court initially found that AMP had failed to establish any protectible trade secrets with respect to the products manufactured by its Components & Assem-

blies Division. The court found that the electronic components produced were low technology commodity products which could be easily reproduced, and that much of the AMP product information possessed by Mr. Fleischhacker was already known to virtually all of AMP's competitors and easily available from widely circulated public sources. AMP does not contest this finding on appeal, asserting that it never contended that its connectors themselves constituted trade secrets (Pl.Br. 25–26). Rather AMP contends that it has protectible trade secrets in a host of confidential information to which Mr. Fleischhacker had access during the course of his employment at AMP. This information, it alleges, includes: business and strategic planning information for the Components & Assemblies Division; new product development information; manufacturing information, including equipment, processes, cost and capacity information; financial information, including product-line profit-margin, sales, and budget information; and marketing and customer information.

■ AMP has consistently failed throughout this litigation to identify any particularized trade secrets actually at risk. Prior to trial, AMP submitted six single-spaced, typewritten pages listing by general item and category hundreds of pieces of AMP internal information. Other courts have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets. See, *e.g., Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 954, 956–957 (Fed.Cir.1984). In its principal brief to this Court, AMP has again refused to specify precisely what trade secrets it believes to be at risk by identifying particular documents or other sources of information, relying on its by now familiar refrain that Mr. Fleischhacker has misappropriated "confidential business and technical information." [2] We will not

search through the record in an endeavor to locate material which the parties have failed to provide us. It is neither the role nor the obligation of an appellate court "to cast about in the record for facts and argument upon which the [parties] may rely." *American Can Co. v. Mansukhani,* 814 F.2d 421, 425 (7th Cir.1987); see *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986).

In its original judgment order, the district court held that AMP had failed to establish the existence of any trade secrets (Pl.App.A, pp. 19–20). In a subsequent order clarifying its original order, however, the court held that AMP had demonstrated the existence of "protectible business secrets" (Pl.App.B, p. 2), although significantly it *too* failed to list any particular pieces or type of information that warranted protection. Despite this finding, the court nevertheless concluded that no relief was warranted because AMP had not shown any likelihood that Mr. Fleischhacker would compromise any of the information known to him. AMP now argues that this clarifying order precludes the defendants from contesting the existence of trade secrets and that under Illinois law irreparable harm is presumed to follow if a protectible interest is not protected.

Our examination of Illinois law reveals that the district court erred as a matter of law when it held that the general confidential information identified by AMP constituted protectible business secrets. As explained above, where the parties have entered into a restrictive covenant not to compete, the scope of protection afforded a former employer is quite broad and may extend to the type of generalized confidential business information to which AMP points. See, *e.g., Cincinnati Tool Steel Co. v. Breed,* 136 Ill.App.3d at 274, 90 Ill.Dec. at 467, 482 N.E.2d at 174; *Smith Oil Corp. v. Viking Chemical Co.,* 127 Ill.App.3d at 427, 82 Ill.Dec. at 253, 468 N.E.2d at 800; *Tower Oil & Technology*

---

**2.** At oral argument AMP finally attempted to identify three specific documents allegedly authored by Mr. Fleischhacker which contained trade secret information at risk of misappropriation. Such argument comes too late. As this

Court has repeatedly held, arguments not raised in the briefs are waived. See, *e.g., United States v. Hornick,* 815 F.2d 1156, 1159 (7th Cir.1987); *In re Bear,* 789 F.2d 577, 579 (7th Cir.1986).

*Co. v. Buckley,* 99 Ill.App.3d at 644, 54 Ill.Dec. at 849, 425 N.E.2d at 1066. Absent such a covenant, however, the plaintiff must demonstrate the existence of a genuine trade secret to obtain injunctive relief. As Judge Shadur noted in *Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 511 (N.D.Ill. 1985), the "right to impose contractual restraints does *not* render the same knowledge 'trade secrets' in the absence of such restraints."

In marked contrast to those cases involving the enforceability of a restrictive covenant, the Illinois courts have not extended protection under the common law of trade secrets to the kind of generalized confidential business information on which AMP relies. In *Cincinnati Tool Steel Co. v. Breed,* 136 Ill.App.3d 267, 90 Ill.Dec. 463, 482 N.E.2d 170, the plaintiff alleged that a former office manager/sales manager had misappropriated confidential pricing information, including cost, special discounts and supply information. The court refused to find that the plaintiff had a protectible interest in this information warranting injunctive relief. The defendant former manager had not taken any documents or other material with her when she left the plaintiff's employ, and the court concluded that the fact that the defendant might be able to recollect pricing information that could potentially be used to the plaintiff's detriment while later working for one of plaintiff's competitors was simply too conjectural to establish a prima facie showing of a protectible interest. Similarly, in *Smith Oil Corp. v. Viking Chemical Co.,* 127 Ill.App.3d 423, 82 Ill.Dec. 250, 468 N.E.2d 797, the plaintiff alleged that former employees had misappropriated customer lists, customer orders, pricing information, cost information, sample formulas, product formulas, customer correspondence and other special customer information when they left to work for a competitor. Other than the exact formulas for the plaintiff's products, the court held that the information which the plaintiff wanted protected fell into the category of "general skills and knowledge" which an employee is free to take with him when his employment is terminated. Citing the Illinois Supreme Court's decision in *Schulenburg v. Signa-*

*trol, Inc.,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), the court concluded that the defendants could not be prevented from using their general chemistry or sales skills even if they were obtained or developed while working for the plaintiff, or prohibited from making use of individual items of sales information contained in customer lists or reports which they might happen to recall from their independent recollection. 127 Ill.App.3d at 429, 82 Ill.Dec. at 254, 468 N.E.2d at 801. See also *Hayden's Sport Center, Inc. v. Johnson,* 109 Ill.App.3d 1140, 1147–1149, 65 Ill.Dec. 612, 618–619, 441 N.E.2d 927, 933–934 (2d Dist.1982) (general customer and pricing information did not constitute trade secrets); *Midwest Micro Media, Inc. v. Machotka,* 76 Ill. App.3d 698, 704, 32 Ill.Dec. 241, 245, 395 N.E.2d 188, 192 (2d Dist.1979) (former employee's knowledge of customer and pricing information too closely akin to his personal abilities and skills as salesman to be considered employer's property).

These cases are controlling here. The district court credited the testimony of Mr. Fleischhacker that after he tendered his resignation he hurriedly packed his personal papers and belongings under the surveillance of an AMP employee and did not deliberately take with him anything of a confidential nature. AMP has offered no proof to the contrary. See *Smith Oil Corp.,* 127 Ill.App.3d at 431, 82 Ill.Dec. at 255–256, 468 N.E.2d at 802–803 (injunctive relief requires that plaintiff produce evidence that former employee actually took or possessed trade secret information); *Cincinnati Tool Steel Co.,* 136 Ill.App.3d at 273–274, 90 Ill.Dec. at 466–467, 482 N.E.2d at 173–174 (relying on *Smith Oil* to the same effect). The district court did find that in his hurry to depart the premises, Mr. Fleischhacker had inadvertently removed an AMP report which contained confidential information relating to operations in Japan, but concluded that there was no evidence that either he or Molex had ever used the report to AMP's detriment. The record is similarly devoid of any evidence that Mr. Fleischhacker ever systematically recorded, copied, compiled, or even pur-

posefully memorized any of AMP's confidential business information while he was still employed at AMP for use in his new position at Molex. *Cf. Burt Dickens & Co. v. Bodi,* 144 Ill.App.3d 875, 882, 98 Ill.Dec. 695, 699, 494 N.E.2d 817, 821 (1st Dist. 1986) (employee may not surreptitiously copy or memorize trade secret information for use after his termination in the solicitation of his former employer's customers); *Midwest Micro Media, Inc. v. Machotka,* 76 Ill.App.3d at 704, 32 Ill.Dec. at 245, 395 N.E.2d at 192 (distinguishing *Schulenburg* as a case wherein former employee traced or memorized employer's blueprints of its manufacturing technique and then subsequently used them in a competing enterprise).

This is not a case where the plaintiff can point to any tangible work product, such as blueprints, designs, plans, processes, or other technical specifications, at risk of misappropriation. See *Midwest Micro Media,* 76 Ill.App.3d at 704–705, 32 Ill.Dec. at 245–246r, 395 N.E.2d at 192–193. Nor is this a case, like many cited by AMP, involving a former employee who held a technical or engineering position and was responsible for distinct areas of technology and research. Mr. Fleischhacker was a high-level managerial executive who had broad supervisory responsibility for 1200 employees and over 10,000 different products at AMP. AMP now requests that we restrain him from in any way making use of or relying on his independent recollections of generalized business and technical information to which he had access while employed at AMP. Illinois law simply does not authorize such relief.

Any other result would severely impede employee mobility and undermine the competitive basis of our free economy. Like the district court here, many courts have noted that the hiring of a close competitor's executives is a usual and permissible practice in any industry.[3] See *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 957 (Fed.Cir.1984); *Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 514 (N.D.Ill.1985). As Judge Shadur eloquently explained in *Fleming Sales,* 611 F.Supp. at 514:

> That is not to say that [a former employee] may not have derived some benefit from his access to the collective experience of [his employer] (experience to which [the employee] himself doubtless contributed significantly during the course of his employment). It is rather to say such information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses. See *MBL (USA) Corp. v. Diekman,* 112 Ill.App.3d 229, 236–237, [67 Ill.Dec. 938, 944], 445 N.E.2d 418, 424 (1st Dist.1983).

> Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself. It would disserve the free market goal of maximizing available resources to foster competition.... [I]t would not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous business competition.

The persuasive logic of this position is evidenced by the fact that the practical effect of any grant of injunctive relief in favor of AMP would be to prohibit Mr. Fleischhacker from working in the connector industry. In its brief AMP disingenuously claims that the injunctive relief requested would not deny Mr. Fleischhacker

---

**3.** Judge Learned Hand long ago observed:

... it has never been thought actionable to take away another's employee, when the defendant wants to use him in his own business, however much the plaintiff may suffer. It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor. If an employer expects so much, he must secure it by contract.

*Harley & Lund Corp. v. Murray Rubber Co.,* 31 F.2d 932, 934 (2d Cir.1929). Mr. Fleischhacker was employed at AMP under a contract terminable at will and thus was free to leave at any time. The district court found that Molex had done nothing improper in its recruitment of Mr. Fleischhacker by offering him a higher salary than AMP was willing to pay and by agreeing to pay his defense costs in the event of litigation by AMP.

his choice of employer, *i.e.*, Molex, but would only remove him from the conflicting position he now holds. Molex, however, obviously hired Mr. Fleischhacker as a result of his expertise, skill, and experience as a Director of Marketing in the connector industry. It is unlikely that Mr. Fleischhacker would be of much use to Molex in a position wholly unrelated to the duties he performed at AMP. The same would undoubtedly be true of any other company in the connector industry.

Our holding by no means leaves an employer helpless against a former employee using the skills and knowledge he acquired during the course of employment to obtain an undue competitive advantage. An employer is always free to protect its interests through a reasonable, restrictive covenant not to compete. See *Tower Oil & Technology Co. v. Buckley*, 99 Ill.App.3d 637, 643–644, 54 Ill.Dec. 843, 849, 425 N.E.2d 1060, 1066 (1st Dist.1981) (generalized confidential information disclosed to employee during the course of his employment may be protected by a restrictive covenant). But when an employer has failed to take such a simple step on its own, a court will not raise to trade secret status "the fruits of ordinary experience in ... business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market." *Fleming Sales Co.*, 611 F.Supp. at 515.

Although we conclude that AMP has failed to establish the existence of any particularized trade secrets, it is necessary to discuss briefly one of AMP's chief contentions on appeal: namely, that if it had established the existence of a protectible business interest, it would not have been required to show irreparable harm, but rather such harm would have been presumed to follow if the interest was not protected. The cases cited by AMP in support of this proposition, *McRand, Inc. v. Van Beelen*, 138 Ill.App.3d 1045, 93 Ill.Dec. 471, 486 N.E.2d 1306 (1st Dist.1985); *Morrison Metalweld Process Corp. v. Valent*, 97 Ill.App.3d 373, 52 Ill.Dec. 825, 422 N.E.2d 1034 (1st Dist.1981); *Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist.

1979); *Armour & Co. v. United American Food Processors, Inc.*, 37 Ill.App.3d 132, 345 N.E.2d 795 (1st Dist.1976), all involve the enforcement of post-employment restrictive covenants not to compete. Under Illinois law, a plaintiff seeking to enforce such a covenant must first establish the existence of a protectible business interest. Once a protectible interest is shown, "irreparable injury is presumed to follow if the interest is not protected." *McRand*, 138 Ill.App.3d at 1054, 93 Ill.Dec. at 478, 486 N.E.2d at 1313. Because the employer has taken care to guard his interests by executing a restrictive covenant expressly contemplating injunctive relief to prevent future violations, the Illinois courts have not insisted on a specific showing of irreparable injury. This principle, however, has no application in cases where the employer has not sought contractual protection. Indeed the court in *Armour v. United American Food Processors* gave express recognition to this distinction when it held that the confidential information at issue there "would not be protected in the absence of an express agreement." 37 Ill.App.3d at 138–139, 345 N.E.2d at 800.

In cases where there is no contract restricting a former employee's competition with his employer, the Illinois courts have always required a showing of irreparable harm absent injunctive relief. In *Smith Oil Corp.*, the court held that "[t]he requirement of the showing of imminent injury is not satisfied by proof of a speculative possibility of injury and '[injunctive] relief will not be granted to allay unfounded fears or misapprehensions.' (*Barco Manufacturing Co. v. Wright*, (1956), 10 Ill.2d 157, 166) [139 N.E.2d 227]." 127 Ill.App.3d at 431, 82 Ill.Dec. at 256, 468 N.E.2d at 803. Finding no evidence that the former employees had actually taken any trade secrets with them when they left the plaintiff's employ or that they were engaging in any ongoing unfair activity, the court reversed the lower court's injunctive order restricting the employees' conduct at their new employer. *Id.* at 432, 82 Ill.Dec. at 256, 468 N.E.2d at 803. Even more to the point is the court's conclusion in *Cincinna-*

*ti Tool Steel Co. v. Breed* that where the defendant former employee had expressly denied that she had either disclosed confidential information or intended to disclose such information in the future, the plaintiff could not establish irreparable harm by merely offering evidence that the defendant had had access to confidential customer and price data while employed by the plaintiff. 136 Ill.App.3d at 283, 90 Ill.Dec. at 473, 482 N.E.2d at 180.

■ The district court found that AMP had failed to show any likelihood that Mr. Fleischhacker would compromise any of AMP's confidential business information known to him. AMP presented no evidence that he had disclosed or used AMP confidences since he began working at Molex. According to the district court, AMP further failed to prove that "any confidences, if obtained, would be useful to Molex or would give it any advantages over AMP in the marketplace." (Pl.App.A, p. 22). AMP's lame protestations that Mr. Fleischhacker's assumption of the Director of Marketing position for Molex's Consumer Products Division has created an inherent conflict of interest making it inevitable that he will use or disclose AMP trade secret information are entirely insufficient to demonstrate irreparable injury. The district court was thus correct in ruling that even if AMP had established the existence of particular, protectible trade secrets, no injunctive relief was warranted because it had failed to show that any such information had been misappropriated or was at risk of misappropriation.

■ Finally AMP challenges the district court's judgment in favor of defendant Molex on its unfair competition claim. AMP had alleged that Molex's recruitment of Mr. Fleischhacker was part of a larger scheme to obtain AMP confidential business and technical information. While the district court found that in the past Molex had indeed hired employees from AMP as well as from its other competitors, it concluded that there was simply no evidence that Molex had systematically pursued those employees to gain the confidences of AMP. Similarly, the district court found

that Molex had come into possession of an AMP internal document, the "MTA Plan," in 1980, but concluded that there was no evidence that the document was obtained through improper means or that Molex had benefited from its possession of the document to the detriment of AMP.

The district court made these findings after a full trial on the merits, and hence they are subject to review under the clearly erroneous standard. Fed.R.Civ.P. 52(a). As the Supreme Court has admonished, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573–574, 105 S.Ct. 1504, 1511–1512, 84 L.Ed.2d 518 (1985). The clearly erroneous standard ensures that the trial on the merits is "the main event . . . rather than a tryout on the road." *Id.* at 575, 105 S.Ct. at 1512 (quoting *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)). AMP has not made a serious attempt to challenge the district court's findings as clearly erroneous. Much of AMP's attack is directed at the credibility of the defense witnesses. Such arguments cannot prevail. The Supreme Court in *Anderson* instructed that even greater deference is due a trial court's credibility determinations:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* The district court's findings as to the unfair competition claim are not clearly erroneous.

None of the information which AMP alleges that Mr. Fleischhacker has misappropriated rises to the level of a trade secret. Business experience and knowhow as reflected in the information which Mr. Fleischhacker acquired during the course of

his employment at AMP are "not something that the law protects from the rigors of the marketplace." *Fleming Sales Co.,* 611 F.Supp. at 516.

The defendants have cross-appealed from the district court's refusal to impose sanctions against AMP pursuant to Fed.R. Civ.P. 11. We have searched the record and the only reference to Rule 11 that we have been able to find is in two pages of a 69-page transcript of oral argument before the district court on May 10, 1985, concerning various post-trial motions. We reproduce in pertinent part the comments of defendants' counsel:

The committee to revise the Federal Rules of Civil Procedure has dealt with this only two or three years ago, and that's Rule 11. I am here, and I am very serious about this. I'm suggesting to this Court, which can do it on its own, or if this Court wishes, we'll be happy to file such a motion. Did they have notice that we felt this way? You bet they did. In the opening, in the last sentence of my opening statement, no relief is justified in this case unless it might perhaps be justified for us. The very first sentence of our first brief says simply this lawsuit should never have been brought. I think this Court—Rule 11 deals—I want to dwell on it just a minute—with a variety of wrongs. Pleadings, motions, et cetera filed for an improper purpose, such as to harass, needlessly increase the cost of litigation; and then it goes on to say that the Court can invoke it on its own initiative, a party can make the motion, and I stated my position on that.

\* \* \* \* \* \*

My own judgment is that what has been shown in this case is that it's probably AMP who is the cause of this. The time when sanctions are to be imposed are at the discretion of Judge Roszkowski.

The rule comments further say it's anticipated that in the case pleadings, and here we have the pleadings with the overlay of those two Supreme Court cases, that is, the conduct of the litigation, would usually be determined, it says in

the comments, at the end of the litigation; and that's where we are.

As I said, I am very sincere about it. I ask your Honor to seriously consider it in our behalf. Thank you.

(May 10, 1985, Tr. 53–54). As counsel's statement reflects, as of May 10, 1985, the defendants had not filed a Rule 11 motion with the district court. The district court's docket sheet indicates that no such motion was filed subsequent to the May 10th argument and prior to the date on which the district court rendered its order and memorandum opinion, March 13, 1986. Other than the short oral comments reproduced above, we have been unable to locate any other arguments, either written or oral, pertaining to Rule 11 which were made before the district court. Indeed in their reply brief on the cross-appeal, the defendants concede that "since defendants' motion for sanctions was not made until after post-trial briefs were filed, no separate discrete Rule 11 arguments were presented by either side." (Def.Reply Br. p. 2 n. 2). In referring to "defendants' motion for sanctions," defendants must mean counsel's oral comments on May 10th since as already noted we simply cannot locate any formal Rule 11 motion in the admittedly voluminous record.

Despite the brevity, and more importantly the lack of specificity, of defendants' counsel's comments and the absence of a formal Rule 11 motion, the district court did briefly refer at the conclusion of its lengthy memorandum opinion to the defendants' "request" that sanctions be imposed against the plaintiff on the ground that the action was brought and pursued for an improper purpose. The district court held that while "the plaintiff had failed in its burden of proving the allegations contained in its complaint," it could not find "that the action was not brought and pursued in good faith." (Pl.App.A, p. 26). It consequently declined to impose sanctions under Rule 11.

The defendants have appealed this judgment by the district court. In addition to reiterating their argument that AMP brought and maintained this lawsuit for an

improper purpose, namely "as a part of AMP's overall competitive strategy to injure Molex and to chill the legitimate aspirations of employees seeking career advancement within the connector industry" (Def.Br. 49), they have advanced in thirty-seven pages of appellate brief the completely new arguments that plaintiff's allegations were made without adequate basis in fact or law and that plaintiff failed to conduct a reasonable pre-filing inquiry into both the factual and legal bases for its lawsuit. Of course the problem with these arguments is that they were never presented to the district court. The briefs which the defendants submitted to this Court should have first been filed with the district court if they seriously wanted us to consider them. Under the course which the defendants have instead chosen to pursue, without even filing a Rule 11 motion below, their arguments based on that rule must be deemed waived. See, e.g., *Ohio Casualty Ins. Co. v. Bazzi Construction Co.*, 815 F.2d 1146, 1149 (7th Cir.1987) ("This Court has repeatedly held that if a party fails to press an argument before the district court, he waives the right to present that argument on appeal."); *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 360 (7th Cir.1987); *Libertyville Datsun Sales v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir.1985) ("[A trial judge] is not obligated to conduct a search for other issues which may lurk in the pleadings" and may properly rely upon counsel to apprise him of the issues for decision).

This Court has recently admonished district court judges that they should give serious attention to serious Rule 11 motions. See *Szabo Food Service v. Canteen Corp.*, 823 F.2d 1073, 1084 (1987). However, if litigants expect district court judges to give Rule 11 motions serious treatment, those motions must be presented in a serious and thorough manner. While a district court may of course raise the issue of Rule 11 sanctions *sua sponte*, it is under no obligation to pay any heed to the kind of haphazard and ill-formulated comments advanced by counsel for defendants here.

Because the sole argument raised by defendants' cross-appeal is one that was not properly presented to the district court, we are tempted to impose sanctions against them pursuant to Fed.R.App.P. 38 for filing a frivolous appeal. See *Weinstein v. University of Illinois*, 811 F.2d 1091, 1098 (7th Cir.1987). However, the plaintiff here is not an appropriate beneficiary of such an award. Instead of recognizing and informing this Court that defendants' appellate arguments were never presented to the district court, it filed a twenty-one page brief discussing the merits of the arguments raised only on appeal! The gross carelessness exhibited by all parties on the cross-appeal has resulted in wasting a substantial amount of this Court's time and resources, with the result being that "less time is available to deal with the claims of litigants who have substantial, unresolved questions." *Weinstein*, 811 F.2d at 1098. The parties' counsel should take special heed in the future to avoid imposing such unjustified and wholly unnecessary inroads on the work of the federal judiciary.

The judgment of the district court is affirmed.