[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, New England Insurance Agency, Inc. (New England), has instituted this action in two counts against the defendants Edward J. Miller (Miller) and Joseph Golden Insurance Agency, Inc. (Golden). The first count is directed against both Miller and Golden. As against Miller it alleges that the plaintiff employed him as a salesman from September 19, 1983 to January 6, 1989, that he then procured employment with Golden at which time he solicited the business of plaintiff's customers by telephone and mail, that when employed by the plaintiff he was in a position to learn and did familiarize himself with New England's "confidential trade secrets in the nature of customer lists. . . .,"[1] that the customer lists and related information were trade secrets of the plaintiff, that because of the confidence reposed in him while employed by the plaintiff he was obligated during that employment and thereafter "to maintain secret and confidential trade secrets, business techniques, discount policies and trade practices", that incident to his employment with the plaintiff he had entered into a written "Employment Contract" which provides that he not engage in the conduct of which the plaintiff now complains,[2] that despite these obligations Miller and Golden "conspired to appropriate to their own use the confidential and secret information acquired" by Miller while employed by New England and "to use it for their own purposes to the prejudice of the plaintiff in its business by utilizing the CT Page 2874 customer lists. . ." as well "as other confidential documentation. . .[3] for a general solicitation to plaintiff's customers" and that "as a result of the theft of the trade secrets" by Miller, "the plaintiff has suffered irreparable harm and damage to its business, a potential loss of customers, with a resultant reduction in profits, all to its loss and detriment, and such acts of the Defendants, as alleged above, have resulted and will continue to result in their unjust enrichment and are damaging Plaintiff's business and the Defendants, unless restrained, will continue to be unjustly enriched to Plaintiff's prejudice and damage." The allegations of the first count conclude by asserting that the plaintiff is not now able to estimate the damage it "has been and will be caused" by Miller until an accounting is rendered.
The second count which is against Golden only repeats all the allegations of the first count and adds that Golden's conduct constitutes an unfair trade practice under the Connecticut Unfair Trade Practices Act known as "CUTPA." See General Statutes 42- 110a, et seq. The relief sought by the plaintiff includes temporary and permanent injunctive relief,[4] money damages, an accounting of any profits realized from or attributable to the use of the claimed confidential and secret information, any CUTPA remedies and any further relief deemed appropriate.
Golden's answer, in effect, denies the allegations of the complaint made against it. Miller's answer does likewise and, in addition, pleads a special defense which alleges, inter alia, that the provisions in section 13 of the written employment agreement with the plaintiff restricting him from doing insurance business "within twenty-five (25) miles of the Town of Cheshire. . ." within "two to three years"[5] of the termination of this agreement is an unreasonable restraint on competition and should not be enforced.[6] Miller also filed a counterclaim which, in effect, seeks money damages for unpaid commissions, unpaid compensation for business he brought to the plaintiff upon his initial employment with the plaintiff as well as future premiums the plaintiff will realize on that business.
After the trial in this case had commenced and some evidence had been presented, it was agreed by all counsel that this case should be bifurcated and that the court was to decide only the issue of liability on the plaintiff's complaint of the defendants. Accordingly, the court only decides that issue in this opinion.
The plaintiff claims that it is threshold to determine whether "the lists of customers of the plaintiff constitute a trade secret." Although the plaintiff's pleadings as well as its claims of law made orally at the end of the trial did not refer at all to the Connecticut Trade Secrets Act, 35-50, et seq., the CT Page 2875 plaintiff has invoked it for the first time in its post-trial brief. The plaintiff maintains these "lists" are a trade secret under this statute and entitled to its protections. As to the restrictive covenant in the employee agreement, it maintains that that covenant satisfies the five factors to be considered in determining its reasonableness as they are set out in such cases as Robert S. Weiss Associates v. Wiederlight, 208 Conn. 525, 529
n. 2, 546 A.2d 216 (1988). It argues that Weiss is the "persuasive precedent" on the restrictive covenant issue. The plaintiff maintains also that the evidence demonstrates that Golden's conduct was such that it constitutes both unjust enrichment and a violation of CUTPA.
On the other hand, both defendants claim that there are no trade secrets here and that there was not any customer list as claimed and there was no solicitation as alleged. They also dispute that Weiss is the "persuasive precedent" claimed. Miller claims that the restrictive covenant is unenforceable including particularly the area and time strictures and that all the clients that he brought to the plaintiff upon his initial employment by it were and still remain his clients. Golden argues that there is no need to even reach the plaintiff's conspiracy claim given the lack of a trade secret as well as of any customer list and in any event no conspiracy has been proven.
Before going into the facts found on the credible evidence the court points out that it was confronted with certain conflicting evidence which had to be resolved. In addition, it pointed out that it is the plaintiff and not the defendants that bear the burden of proof on the allegations of their complaint given the bifurcation which makes unnecessary here the consideration of the defendant Miller's counterclaim.
Miller had been in the insurance business since about 1973 when he was associated with Metropolitan Life Insurance. He worked for Metropolitan until about 1981. This was in the Waterbury area and particularly in the City of Waterbury. He was originally from Waterbury where he has had over the years a number of relatives and made many friends in his business, social and political activities. He presently lives in Prospect where he has served as president of the JCC. He is married and has two children. About 1981 he became associated with two other persons in the sale of general insurance during the course of which he wrote insurance, including automobile, homeowner's, worker's compensation and the like for several insurance companies. The relationship continued for about two years and he then became associated with New England in September 1983.
Upon doing so he brought with him a number of insurance accounts. He did not, however, bring or give a list of them to CT Page 2876 New England at that time as he had made no list. He still has no list of those accounts although the evidence disclosed that, from information gleaned in his earlier deposition taken by the plaintiff, that he recalled that a large number of the names posed to him at that time were identified by him and were customers he originally brought to New England in September 1983. New England itself from that time to this has no list of those customers.
Notably, Miller was associated with New England for about thirteen months before the written employment agreement which includes the restriction covenant involved in this case was executed. Peculiarly, this agreement is completely undated as to when it was executed and the Xeroxed copy of it in evidence, other than the typewritten portion, contains only the reproduced signatures of the then president of New England and that of Miller. It does, however, recite that the term of the agreement begins on October 15, 1984 ". . .and shall continue in the manner provided herein. . . ."
Despite the fact that the agreement was not executed for over a year after Miller began his association with New England, it would appear that his compensation from New England was in accordance with the agreement from the outset, i.e. from September 1983. Although Miller subpoenaed from New England his broker productions records for 1983 through January 1989, Miller's production records for the years 1983 and 1984 were said to have been destroyed. These production records, like some of those for later years that were produced by subpoena, would have disclosed the commissions he was paid and on which accounts commissions were paid for those years. The absence of such records complicated the claim of Miller that the accounts he brought with him remained his throughout despite New England's claim that such accounts became theirs upon his employment under the later executed employment agreement[7] and that Miller got his commissions on such accounts which was all he was entitled to. This would also serve to make more difficult the proof of New England's position that what business Miller produced after he came to this agency belonged to the plaintiff and once he was paid his fifty percent commission on that business that discharged New England's duty to Miller as to such business and that New England owned those accounts under the employment agreement. There was evidence that this was discussed, without resolution, from 1984 but more so in the later stages of Miller's association with the plaintiff. New England also claims that the companies for which Miller was authorized to write insurance had "indicated to us [New England]" that they did not intend to stay with Miller, so New England's taking Miller on gave him "survival." Other than this bare assertion, which is not credible, no evidence of any such indication is before this court. But there is evidence that New England did not code into their system companies for which Miller wrote until some time after he CT Page 2877 became employed by it. That did take place some months before the employment agreement was first shown to him, about eleven months after he started at New England.
Computer generated monthly production/broker statements were created to show what commissions were due a particular producer, as to particular accounts, such as salesmen like Miller. This is the way a particular salesman like Miller has of checking to see if he receives the commissions he believes he is entitled to. They also include the customer's name, the insurance company's number, the policy number, the nature of the transaction for that statement such as "new", "ren", "can", etc., the effective date, the gross premium, the commission rate, the amount of the commission paid and the renewal date. These producer/broker statements, according to the plaintiff, allegedly constitute the customer lists of the plaintiff which Miller is accused of misappropriating and using improperly with Golden. Miller served a subpoena upon New England for all such statements from 1983 through January 1989. New England could not produce any for 1983 or 1984. Two months of 1985 reportedly could not be found. Nor could those for eight months of 1987 as well as the one for January 1989 be found to respond to the subpoena. These were those monthly computer generated producer/broker statements that New England maintained were typical of their so-called customer lists. In any event, Miller's production of business increased each year so that in five years at New England his production doubled. According to Matthew Cassidy, a principal of New England, all the business Miller produced while in their employ was that business that Miller brought with him in 1983 and that which Miller himself produced thereafter.
Cassidy was the main party with whom Miller dealt while at New England from the very start. From 1984 on Miller had discussed with him Miller's becoming a part owner of the plaintiff. Although the employment agreement specified no definite term of years for Miller's employment, Cassidy testified more than once that it was to last for five years. Miller apparently felt likewise.[8] In any event over the last couple of years Miller and Cassidy discussed Miller's desires in this regard including Miller's wishes to cease being an agent and becoming an independent contractor. Miller pressed this with Cassidy who said that he would be presented with an independent contractor proposal. This matter, however, dragged on. Finally, just before Christmas 1988, Cassidy presented Miller with a lengthy written proposal or an "Independent Contractor/Captive Agent Agreement" which Miller rejected as unacceptable.
Miller formally notified New England of the termination of his association with them on January 6, 1989 and very shortly thereafter assumed employment with Golden. That association came CT Page 2878 about in the following fashion: Seymour Golden, president of Golden, first met Miller on June 10, 1988, after Golden answered a blind advertisement inserted in an insurance publication by Miller. This advertisement, inter alia, indicated that an experienced insurance agent with a large book of personal and commercial lines "would like to buy into medium or large agency in Connecticut."[9] At that time Golden got information about his background, his family and the companies he could write for. He did not ask Miller about his book of business. Miller did give him a business card at that time which indicated that he was associated with the plaintiff. Miller did not tell Golden that he had a written employment agreement with the plaintiff or that there was a restrictive covenant involved. After that meeting Seymour Golden wrote Miller opining that they had had a good meeting and asking him "to get in touch with us as soon as you straighten out your position with your present firm so we can arrange another meeting." The two met again in August 1988. Miller told Seymour Golden that he was then involved with his attorney looking toward a new contract from the plaintiff, that he was not available for employment at that time but that he (Miller) would be in touch. Again there was no mention that Miller had an agreement with a restrictive covenant. Moreover, there is no evidence that he was in fact offered employment at that time.
They met again in December 1988. Salary was discussed (all Golden's employees are salaried, not on commission) as well as the territory Miller would operate in. Miller asked for a contract and Seymour Golden refused. Again Miller did not say that he had a written agreement with a restrictive covenant with the plaintiff. Miller did not at any time give Seymour Golden or anyone at Golden a list of names of customers he had written insurance for while at the plaintiff. Miller did not have or make any such list. He did, however, have copies of certain of his monthly production broker/statements which he had kept when he left the plaintiff. Shortly after his employment by Golden, Miller sent out a number of letters on Golden's letterhead to some people that he had serviced while he was with the plaintiff; one of these letters was an exhibit at the trial.
Early in February 1989 this action was instituted at which time an ex parte restraining order was entered against the defendants because they were "using misappropriated customer lists taken from the Plaintiff, resulting in irreparable harm to Plaintiff's sales system and its good will and reputation, developed after many years of work and investment. . . ." Seymour Golden immediately spoke to Miller after process had been served, learned of the written agreement with the restrictive covenant, and he examined it. He then ordered Miller not to operate in the territory covered by the restrictive covenant. Later this ex parte order was in large measure modified by agreement of counsel. CT Page 2879
Our Supreme Court has said that "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competition who do not know or use it. It may be a formula for a chemical compound. . .or a list of customers. Restatement, 4 Tort 757, comment b; Allen Mfg. Co. v. Zoika, 145 Conn. 509, 516, 144 A.2d 306 [1988]." Town County House Homes Services, Inc. v. Evans, 150 Conn. 314,318, 189 A.2d 390 (1963); see Robert S. Weiss Associates v. Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988); Plastic 
Metal Fabricators, Inc. v. Roy, 163 Conn. 257, 264 n. 2,303 A.2d 125 (1972). In Allen Mfg. Co. v. Zoika, supra, 515, 516, the court did note that "definitions of `trade secret' abound in the reported cases." The Uniform Trade Secrets Act (UTSA) in this jurisdiction would arguably seem to provide a somewhat broader definition of "trade secret" than our case law. General Statutes35-51 (d).[10] That statute provides in part the following:
 ". . . `trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
Our statute, we note, does include, without defining it, the term "Customer List" which term does not appear in the definition set out in the UTSA. UTSA 1(4). In determining whether New England has proven the existence of a trade secret, this court looks to the common law and our Uniform Trade Secrets Act (Act). The Act, adopted in Connecticut in 1983, codifies basic principles of common law trade secret protection. Historical Notes, 14 U.L.A. 433, 444 (1990). See Electro-Craft Corp. v. Controlled Motion, 332 N.W.2d 890, 898 (Minn.). Therefore, to the extent that the Act modifies the common law, we are constrained to give effect to the statutory language. America Credit Indemnity Co. v. Sacks, 262 Cal.Rptr. 92, 96 (1989); Electro-Craft Corp. v. Controlled Motion, supra; see Skorpios Properties, Ltd. v. Waage,172 Conn. 152, 374 A.2d 165 (1976). Although our Act added ". . .customer lists" as well as ". . .drawing [and] cost data" to this definition our law, before 1983, recognized that ". . .a list of customers" could be a trade secret. Town Country House 
Homes Services, Inc. v. Evans, supra 318; Allen Mfg. Co. V. Zoika, supra 516: see Robert S. Weiss Associates v. Wiederlight, supra CT Page 2880 538. These cases draw on the Restatement of Torts for that definition, i.e. Restatement of Torts 757, comment b. See Robert S. Weiss Associates v. Wiederlight, supra; Plastic Metal Fabricators, Inc. v. Evans, supra. This Restatement has been said to have been the basic source of the UTSA's definition of "trade secret." See Minutemen Inc. v. Alexander, 434 N.W.2d 773, 777
(Wisc. 1989), citing Klitze, The Uniform Trade Secret Act, 65 MARQ. L.R. 277, 285-286 (1980). Even if arguably all six elements of the Restatement test are no longer required, one court has said that "the Restatement requirements still provide helpful guidance in deciding whether certain materials are trade secrets [under the new Wisconsin statutory definition]." Minuteman Inc. v. Alexander, supra 778. One acknowledged commentator has said "Notwithstanding the attempts to define trade secrets, it is more than likely that the Restatement definition will continue to have both vitality and interpretative force." See 12 R. Milgrim on Trade Secrets, 2.01[1] 1987, see also Penetone Corp. v. Palchem Inc., 627 F. Sup. 997, 1005 (N.D. Ohio 1985).
The idea of "independent economic value" carries forth the common law idea of competitive advantage. Electro-Craft Corp. v. Controlled Motion, supra 700. Another element to be considered in determining if a trade secret exists is whether it, i.e. the claimed trade secret, has been the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Secrecy, of course does not have to be absolute. Our case law has stated that "a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by use of improper means." Robert S. Weiss Associates Inc. v. Wiederlight, supra 538, citing to Town Country House 
Homes Service, Inc. v. Evans, supra 319 (both customer list cases). Allen, a manufacturing process trade secret case, said "Reasonable precautionary measures for maintaining the secrecy of the process were all that was required." and that is a question of fact. Allen Mfg. Co. v. Zoiko, supra 516. The employer must show it was intended that the information involved be a trade secret.
Whether a customer list is entitled to trade secret protection is to be determined under the circumstances of the individual case. Robert S. Weiss Associates v. Weiderlight, supra 538, 539; Allen Mfg. Co. v. Zoika, supra; Holiday Food Co. v. Munroe, 37 Conn. Sup. 546, 551-552, 426 A.2d 814 (1982). The plaintiff has the burden of proof on this issue. It has been pointed out that customer lists have been said to be on the periphery of the law of trade secrets and unfair competition. See Holiday Food Co. v. Munroe, supra; Corron Black-Rutters 
Roberts v. Hosch, 325 N.W.2d 883, 888 (Wis. 1982) (insurance agency customer list); Developments in the Law-Competitive Torts, 771 Harv. L.R. 888, 955-956 (1964). Nevertheless a customer list may be a "trade secret" under UTSA, see e.g. Kozuch v. Cramar CT Page 2881 Video Center Inc., 478 N.W.2d 110 (Ind.App. 1985), just as it has been so held under common law decisions.
Turning to the circumstances of this case and examining the not generally known or easily ascertainable element of eligibility for trade secret protection, matters which are generally or commonly known to the trade in which the putative trade secret owner is engaged cannot be viewed as trade secrets, or to state it differently, a matter cannot be considered a trade secret "if it is well-known or readily ascertainable." 1 Milgrim on Trade Secrets, 2.07[1]; Surgidev Corp. v. Eye Technology, supra 688. The so- called customer list, such as it was in this case, was not well-known in the insurance business nor can it be said, in the evidence, to be readily ascertainable by one outside the plaintiff to whom it might be useful.
It can also be said that the so-called customer list in this case does derive some independent economic value from not being known to or be readily ascertainable by proper means. Again because an outsider might obtain a potentially valuable advantage by having access to such information, that information may be subject to trade secret protection because it is not generally known or readily ascertainable. Milgrim, supra; Electro-Craft Corp. v. Controlled Motion, Inc., supra, 900. While the retention of such information provides the plaintiff independent economic value, actual or potential, from its secrecy, the plaintiff would lose certain of that value if any outside prospective competitor could access its market without itself incurring a substantial development expense for generalizing this information of the plaintiff. This, in turn, requires that the plaintiff also prove, as the statute requires, that the protection trade secret, the so- called customer list, has been "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." See General Statutes 35-51 (d). The plaintiff has not sustained its burden on this. "`Reasonable' is a relative term which varies in the context in which it is used, and its meaning may be affected by the facts of the particular controversy. 36 Words Phrases, (1959 Sup.). It is also synonymous with [e]quitable, fair, just. Webster, New International Dictionary (2d Ed., Thompson v. Beacon Valley Rubber Co., 56 Conn. 493, 498, 16 A. 554." E. M. Loew's Enterprises, Inc. v. Surabian, 146 Conn. 608, 612, 153 A.2d 463
(1959). So it is with "secrecy" as "In any context `secrecy' is a relative term and, as used in the law of trade secrets, it is not an absolute but an equitable concept." A. H. Emery Company v. Marcan Products Corporation, 389 F.2d 11, 16 (2nd Cir. 1968).
The alleged trade secrets in this case are Miller's monthly production statements. These were given to Miller from time to time by the plaintiff and he took at least some with him; these statements are the only thing that Miller did take with him when CT Page 2882 he left. What statements, however, which he took with him was not disclosed by the evidence. Also these statements were the vehicle by which a particular broker producer such as Miller had of checking whether he had been properly credited with the commissions to which he was entitled or the propriety of any debits by the plaintiff against those commissions. It deserves saying here that there was no "theft" of these as the complaint alleges. Moreover, some of these "customer lists", in addition to what we have said they contained, have written notations on them that the evidence showed were such things as moneys deducted for Miller's Social Security, deductions from commissions due him of amounts unpaid by the customer on premiums and as well as some deduct ions from moneys owed Miller which could not be explained at the trial by the plaintiff who made them. The plaintiff's position is, nevertheless, that the commission statements belong to Miller, but the names on them belong to the plaintiff.
The employer must show it is intended that there is a trade secret. The view that the former employer demonstrate time, effort and expense to compile the "trade secret" so as to have the right to trade secret protection has not gone unnoticed by courts. See, e.g. Surgidev Corp. v. Eye Technology, Inc., 648 F. Sup. 661,663 (Minn. 1986); Cincinnati Tool Steel Co. V. Breed,482 N.E.2d 170, 176 (Ill Corp. 1985); Russell v. Ruesch International Monetary Services, Inc., 479 A.2d 295, 298 (D.C.App. 1984); Town Country House Home Service v. Newbury, 3 N.Y.2d 554,170 N.Y.S.2d 328, 147 N.E.2d 724 (1988). Under the circumstances of this case the plaintiff has not demonstrated that it invested the time, effort and expenses in compiling the alleged customer lists that the cases indicate is necessary to factor into the conclusion they constitute a trade secret.
The plaintiff points to paragraph ten of the employment agreement[11] entitled "Disclosure of Information," which refers to "the list of Employer's customers as it may exist from time to time [as] valuable, special and unique asset of the Employer's business. . . ." Like the agreement in Weiss, it does not refer to them as trade secrets although it provides against disclosure. Yet such an agreement cannot be dismissed as an empty formality. Secrecy is an essential element of a trade secret. So if one claims entitlement to a trade secret and wishes to have its exclusive use for his own business, he must not fail to take all proper and reasonable steps to keep it secret. See Jet Spray Cooler, 361 Mass. 835, 841-842, 282 N.E.2d 921 (1972).
Keeping in mind, inter alia, that the "lists" were accounts Miller handled himself (his name appears on the top of each sheet) and that the evidence disclosed an unusual loyalty to him personally by his customers and that no one else at the plaintiff serviced his clients. More is needed in this case than the mere CT Page 2883 language of paragraph ten to show reasonable efforts for secrecy. The plaintiff did not restrict anyone from their files although it is claimed that there is a "you do not peruse my files and I do not peruse yours" understanding. There is no evidence that there has been a declared policy touching on security of such "lists." There are no markings on them such as "confidential" or "not to be disclosed" or the like. See e.g. Surgidev Corp. v. Eye Technology, Inc., supra 692-693. Physical security measures are one way of signaling to employees that certain information is secret Electro-Craft v. Controlled Motion, Inc., supra 904. There is no indication that they are kept under lock and key. See Cincinnati Tool Steel Co v. Breed, 482 N.E.2d 170, 177 (Ill.App. 1985). In fact, the "lists" relied upon as constituting the trade secret, as has already been pointed out, could not even be fully produced when subpoenaed. At the trial some were produced on one day as it was said that they were all that could be found. The following day others were produced. Some were never produced and were said to be "missing" or "destroyed." Significantly, Miller's commission statement for January 1989 during which month he formally left the plaintiff, and which statement would, the plaintiff admitted at trial, show whether he was entitled to a contested commission of about $814.00 due Miller could not be found.[12] These considerations do not aid the secrecy claim given the inability and/or difficulty of the plaintiff in locating and producing its own records of the so-called trade secret. On the evidence the court cannot find that the customer list claimed has been "secured by years of business effort and advertising and the expenditure of time and money [by the plaintiff]. . . ." Town 
Country Houses Homes Services, Inc. v. Evans, supra 319. Insofar as the plaintiff's "customer lists as they may exist from time to time. . ." is concerned, there was evidence of the attrition among clients as they seek out better service or better premium rates and there can be no claim that the lists, such as they are, fairly include "near permanent customer relations." See Cincinnati Tool Steel Co. v. Breed, supra 178. Nor did the "lists" contain comprehensive market data. Cf. Corroon Black Rutters Roberts v. Hosch, supra 884. Not only did it not contain any addresses or phone numbers of the accounts, but more notably, they did not contain, as the plaintiff's complaint alleges, ". . .customer discount information, mail lists of information, key personnel of customers who were influential in buying decisions, and discount policies, as well as invaluable credit information, all of which was compiled and analyzed for easy access and to facilitate its use and maximize its (New England's) profits." There is no evidence to support proof of any of these allegations and so we are left only with the "customer lists" portion of this allegation. Fairness, however, requires saying that such information as Miller gleaned from these monthly production statements would arguably allow him access to their needs. CT Page 2884
During the trial, Miller produced at least four witnesses who were obviously loyal to him and wanted him personally and no one else to handle their business. On the other hand, the plaintiff did not produce a single customer who he had allegedly solicited after his departure despite claims to the contrary. The circumstances that at some time after he went to work for Golden, Miller did write insurance for a number of persons formerly with New England does not in this case require a different conclusion. This is because the relationship and conduct between the parties is to be considered; it is appropriate to balance a plaintiff's conduct in maintaining its security measures against the conduct of a defendant in "acquiring" the information. USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 98, 393 N.E.2d 895, 900
(1979). The court cannot conclude that the so-called customer lists were the subject of efforts by the plaintiff that were reasonable under the circumstances to maintain their secrecy and are, therefore, not entitled to trade secret protection under the Act. See Conn. General Statutes 35-50 et seq.
Turning to whether trade secret protection should be accorded under the common law which was the plaintiff's presentation at the trial, the court, employing the legal guidelines which were used in Weiss (See Robert Weiss Associates v. Wiederlight, supra 537- 538), comes to the same conclusion. At the outset, here, we note plaintiff's argument that Weiss sets out "the classic definition of a trade secret," referring to Robert Weiss Associates v. Wiederlight, supra at 538. It claims that Weiss is controlling on that phase as well as the restrictive covenant aspect. In this court's view, Weiss, which upheld the trial court's conclusion that "the customer list and related information" were not trade secrets, is quite analogous to this case. In Weiss, the alleged trade secrets were, as here, monthly production reports, which included in addition to what there is in this case "`prospect cards,' containing data gathered by the plaintiff's sales force concerning potential customers." Id. 537-538. That is not so here. Here, similar to Weiss, Miller was allowed to keep his monthly production reports. Here, like Weiss, no real question is raised that Miller took at least certain of his monthly production reports with him. While not completely like Weiss, the reports Miller kept, though not as expansive as those in Weiss, could be said to provide Miller with the information he needed to "solicit", if he did, the insurance business of customers listed there. Here, as in Weiss, this court can find that Miller personally developed and serviced the customers listed in those reports. There is no evidence in this case to show that Miller "appropriated" the customer of any other salesman with the plaintiff.[13] Again, as in Weiss, Miller's personal relationship with his customers did allow him access to their insurance needs. This court can also find, as in Weiss, that Miller was the only CT Page 2885 agent his customers dealt with while at the plaintiff. In addition, in this case Miller produced evidence that some customers followed him on their own after he left because of the service he gave them. In Weiss the evidence was conflicting as to security measures. In that case the employer testified that its comptroller had exclusive control over the expiration lists which were kept in a locked cabinet. Robert S. Weiss Associates, Inc. v. Wiederlight, supra 539. The defendant Wiederlight, however, testified that summaries of the insurance policy accounts containing data on coverage, premiums and expiration dates were kept in open and unlocked files. Id. Similar to the case before us, the evidence in Weiss indicated that the Wiederlight acquired information on the accounts he sold while working for Weiss was by calling on the accounts himself. Id. This court believes that Weiss, which sustained the trial court's conclusion that "the customer list and related information [on that case] were not trade secrets," supports the defendants' position in this case more than that of the plaintiff. The plaintiff has not proven the existence of a trade secret under Weiss or our common law decisions.
 II
Restrictive covenants
We turn now to the consideration of the employment agreement, and particularly the restrictive covenant in paragraph 13 of that employment agreement. In doing so we do not overlook that "after the employment has ceased the employee remains subject to the duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer. . . ." Allen Mfg. Co. v. Zoika, supra, 514. Such information may be a proper subject of protection by a restrictive covenant. Rollins Burdick Hunter of Wisconsin v. Hamilton,304 N.W.2d 752, 756 (Wis. 1981) and cases there cited. Such a covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. Scott v. General Iron Welding Co.,171 Conn. 132, 137, 368 A.2d 111 (1976); New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 533, A.2d (1989); Cf. Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 255, 108 A. 541 (1919). Such a restrictive covenant, however, must be reasonably limited and fairly protect the interests of the parties and the public. Robert S. Weiss Associates, Inc. v. Wiederlight, supra, 530. The reasonableness of a restrictive covenant must be evaluated by these five criteria: (1) the geographic area covered by the restriction; (2) the length of time the restriction is to be in effect; (3) the degree of protection afforded to the party in whose favor the covenant runs; (4) the restriction on the CT Page 2886 employee's ability to pursue his occupation, and (5) the extent of interference with the public's interest. Scott v. General Iron Welding Co., supra, 137-138; New Haven Tobacco Co. v. Perrelli, supra, 533-534.
The defendant attacks this covenant first as to its geographical area coverage. The application of a restrictive covenant must be confined to a geographic area that is reasonable in view of the particular situation. Scott v. General Iron 
Welding, supra, 138; Torrington Creamery Inc. v. Davenport,126 Conn. 515, 519, 12 A.2d 780 (1940). It is established that judicial notice may be taken on the geography of a state, the existence, location and population of its counties, distances between well-known points and the like. Nesko Corporation v. Fontaine, 19 Conn. Sup. 160, 162, 110 A.2d 631 (1954). The parties have asked the court to take such judicial notice in this case. The geographical portion of the restrictive covenant in this case is described as "an area within twenty-five (25) miles of the Town of Cheshire, Connecticut, nor in his assigned territory of New Haven County." The "nor in his assigned territory of New Haven County" is interesting on this element for at least two reasons: first, all of New Haven County is within twenty-five miles of Cheshire and secondly, at trial Matthew Cassidy said that he could not say what territory Miller had been assigned in New Haven County. In any event, the evidence most favorable to the plaintiff puts the "within twenty-five miles of Cheshire" to all points of the compass from the approximate center of Cheshire although literally the covenant itself recites otherwise. Twenty-five miles from the approximate center of Cheshire, as opposed to "an area within twenty five (25) miles of the Town of Cheshire" encompasses between thirty-five and forty percent of the land area of this state as well as including well over one-third of the population of this state.[14] The area restriction, as we note, is unreasonable.
Before going further, some discussion with reference to Miller's duty not to solicit, after terminating with New England, customers that he serviced while with the plaintiff, several comments are appropriate. First, if the court assumes, as the plaintiff clearly claims, that the two-year restrictive period applies throughout paragraph thirteen of the employment agreement, then the time duration of that paragraph may well make the time restrictions academic. This is so because the presentation of evidence in this case terminated on January 8, 1991 which was more than two years after the plaintiff was notified by Miller of his termination. Actually, Miller had left the plaintiff earlier than January 6, 1991. Second, the court has already concluded that the so-called customer lists do not constitute a trade secret of the plaintiff either under the statute or at common law and the question has not been raised by the plaintiff as to what happens CT Page 2887 in that event insofar if the liability issue was not resolved in its favor. Postulating that the law will import into a contract of employment a prohibition against the use of a trade secret by the employee for his own benefit if the secret was acquired by the employee in the course of his employment, see e.g. Town Country House Homes Service, Inc. v. Evans, supra, 319, we are then met with the conclusion here that there was no trade secret. Such a conclusion renders fatal any claim it could have made (which it did not) that some sort of confidential relationship prevented Miller's solicitation as a means of obtaining their insurance business. See Electro-Craft Corp. v. Controlled Motion Inc., supra, 903.
We, however, will take note of certain other circumstances. Miller, after commencing his association with Golden, sent out a number of letters to former customers of his while he was at New England; the number he sent was never established, either precisely or approximately. It is fair to say, however, that they were much less than the total of the customers he appears to claim that he brought to the plaintiff and those he generated while there, and again that latter number was never established. In any event, there is in evidence a copy of this letter sent to one Slofa, who was originally a customer of Miller. Miller claims that the letter is an announcement while the plaintiff claims it is a solicitation. It has been said that "At common law, the boundary separating fair and unfair competition in the context of a protected customer list has been drawn at the distinction between an announcement and a solicitation." American Credit Union v. Sacks, 213 Cal.App.3d 622, 262 Cal.Rptr. 92, 99 (1989) (underlining added). It should be no different under the Act. Even assuming the letter can be called a solicitation, it is not a solicitation in the face of a "protected" customer list. Parenthetically, there is no credible evidence that this letter to Slofa caused him to cancel his insurance with the plaintiff. Slofa was not a witness at the trial. For that matter, there is no credible evidence that anyone to whom this letter may have been sent, in fact, cancelled their insurance because of the letter. To be sure there was evidence that accounts with the plaintiff began to be cancelled after Miller left. Significantly, the plaintiff did not produce one witness to say that that had occurred because of the claimed importuning or solicitation by Miller on its claim that Miller violated the restrictive covenants. This, it did not do, despite putting into evidence nine letters or memos to the plaintiff indicating that insurance coverage heretofore furnished by the plaintiff would thereafter be written with Golden. These were dated as follows: one in January 1989, one in April 1989, one in June 1989, one in July 1989, one in September 1989 and four in October 1989. Notably, there is no evidence that demonstrates that Miller did not obey the temporary restraining order that was in effect until July 31, 1989. One court has noted that equity will not enjoin a former employee from CT Page 2888 receiving business from customers of the former employer even though the circumstances are such that the former employee should be prohibited from soliciting such business. Aetna Building Maintenance Co. v. Went, 39 Cal.2d 198, 204, 246 P.2d 11, 18
(1952). Therefore, even if the restrictive covenants did reach Miller, or for that matter Golden, the court does not believe that the plaintiff would be entitled to any equitable relief against either or both defendants.
The explicit language of the covenant prohibits Miller for two years after the employment agreement terminates to "directly or indirectly, solicit or accept any insurance business of any nature, assist or be employed by any person, firm or corporation in soliciting or accepting any insurance business of any nature whatsoever, nor in any way directly or indirectly own, manage, operate, control, be employed by, or participate in, or be connected in any way with the insurance business in an area within twenty-five (25) miles. . ." as well as providing that Miller "further covenants and agrees that during said period of time, he shall not directly or indirectly engage in the business of an insurance agent, insurance broker, insurance consultant or otherwise within said restricted areas indicated above."
The plain language of these two portions of the covenant prohibits Miller, either as an individual or as associate or employee of another, not only from soliciting or accepting, directly or indirectly, "any insurance business" within the restricted area but also that "he shall not, directly or indirectly, engage in the business agent, . . .broker, . . .consultant or otherwise" within that area. No suggestion is made, nor can the court envisage any reasonable opportunity for Miller to engage in the insurance business from any source within that area, a business which has been the source of his livelihood for at least since 1973. These provisions are unreasonable under any prong of the test in Scott v. General Iron Welding, supra. These portions of the restrictive covenant do not impose an anti-sales restriction but do impose an anti-competitive restriction. See New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 534-535. Miller cannot do any insurance business because of these. These portions go beyond protecting the legitimate interests of the former employer and are oppressive and unreasonable as well as excessively interfering with the public's interest.
In addition, by way of a third stricture, the covenant goes on to provide that Miller ". . .shall not (a) canvass, solicit or accept any business for any other insurance agency in said area; (b) give any person, firm or corporation the right to canvass, solicit or accept any insurance business for any other insurance agency from any present or past customer of the Employer; (c) directly or indirectly request or advise any present or future CT Page 2889 clients of the Employer to withdraw, curtail or otherwise cancel their insurance with the Employer."
This third restriction, while not as abstractly total as the earlier two above, does refer to "present and past customers of the Employer" as well as "present or future clients of the Employer." What a "future client" is has not been explained and on the evidence would be more speculation. There is a serious question, however, that because of the overreaching and overbroad nature of the no-insurance business at all of the earlier two portions of the restrictive covenant in paragraph thirteen of the employment whether this third restriction should stand because of the "escape hatch" language later in the same paragraph to the effect that if any portion of the covenants "be adjudged invalid. . .on the grounds that the time limits, geographical area or activity forbidden therein or [sic] unreasonable, thus. . .such covenants are hereby amended and changed and limited so that the time limits, geographical areas and activities forbidden above are each reasonable, lawful and enforceable in equity. . . ." (emphasis added). Despite the language which indicates an intent to permit this portion to remain viable if the earlier two are held unreasonable, this court does not believe that this portion can be held to be reasonable and stand for several reasons. First, the court has already rejected the plaintiff's trade secrets claim based on the so-called customer lists. Second, it would not be equitable to do so because equity does things by halves, i.e. attempt to hold this portion reasonable when it must still hold that the geographical area imposed is unreasonable. It is clear on the evidence that the restrictive covenant unreasonably restricts Miller's ability to pursue his occupation. Scott v. General Iron Welding Co., supra; 6A Corbin on Contracts 1394, pp. 101-104. Moreover, "equitable power must be expressed equitably . Hamon v. Taylor, 180 Conn. 491, 497, A.2d (1986), and equity will look through the form of the transaction to discover what its substance is. Wiser v. Clinton, 82 Conn. 148, 152,72 A. 928 (1909). Under all the circumstances of this employment agreement as disclosed by the evidence, it would be unfair, after balancing all the interests, to separate out this portion and accord it validity not only, inter alia, after rejecting the preceding over-reaching portions but also because the court considers the geographical area restriction unreasonable as well as the latter not being amenable to division as hereafter discussed.
Examining the twenty-five mile geographical area scope of the restrictive covenant, we note here that the plaintiff has requested that, if the court finds this twenty-five mile restriction unreasonable, to reduce it to an area that the court considers reasonable. Here it is apparent that the plaintiff is particularly interested in the Waterbury area. This claim of the CT Page 2890 plaintiff raises the question whether the court can modify the original employment agreement to conform to a reasonable area which is less than the present twenty-five mile radius. There exists a line of authority, known as the "blue pencil doctrine," which maintains that if a court can convert an unreasonable restraint as to territory into a reasonable one by eliminating the unreasonable portion, then the court may do so and then enforce the reasonable portion. See e.g. E.P.I. of Cleveland, Inc. v. Basler, 12 Ohio App.2d 16, 230 N.E.2d 552 (1967). This applies, however, only to contracts where the language as to the restricted area specify distinct areas so that the elimination of the description of one or more of such area portions leaves a description in the contract itself of the area or areas deemed reasonable. See Beit v. Beit, 15 Conn. Sup. 191, 196 (1947). This severance may be accomplished by striking out a restriction that is unreasonable as to area. See Torrington Creamery Inc. v. Davenport supra. Although paragraph thirteen has the "escape hatch" language referred to of partial invalidity, the twenty-five miles of Cheshire provision is, unlike that of Torrington Creamery, not capable of severance. Obviously then the only area that is capable of being struck out is the twenty-five mile radius of Cheshire and, if that were done, there would be no area restriction. This court cannot accept any claim, therefore, that this language was intended to be other than that of an entirety and, hence, not divisible. See Beit v. Beit, 135 Conn. 195, 205,63 A.2d 161 (1948). For this court, therefore, to try to fashion out of the language the parties themselves chose, an area restriction it would claim reasonable would clearly be rewriting the contract the parties agreed upon. This, the court cannot do. Beit v. Beit, 135 Conn. 195, 204-205; Hatcho Corporation v. Aella Pietra, 195 Conn. 18, 485 A.2d 1285 (1985); See Durham v. Stand-By Labor of Georgia, Inc., 198 S.E.2d 145, 149 (1973). Whether the duration of the restrictive covenant is two years or three years, its duration is unreasonable under the circumstances. The nature of New England's business and its geographical reach is such that the area restriction, already deemed unreasonable, cannot reasonably be found to entitle it to that degree of protection. The plaintiff has not sustained its burden of proof on its claim that the restrictive covenants in the employment agreement are reasonable and ought to be enforced. In any event, the earlier conclusion that its claimed customer list is a protected trade secret militates against further discussion of the restrictive convenant claim.
The plaintiff's claim against the defendant Golden as made in both counts of the complaint have not been proven. This applies to those made against Miller and Golden jointly in the first count and against Golden alone in the second count.
Accordingly, on the issue of liability, judgment may enter in CT Page 2891 favor of both defendants as to all counts of the complaint.
ARTHUR H. HEALEY STATE TRIAL REFEREE
FOOTNOTES